# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **REYNALDO E. DOMINGUEZ,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case number 4:13cv1426 TCM** |
| ) | |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W.

Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application

of Reynaldo E. Dominguez (Plaintiff) for disability insurance benefits ("DIB") under Title

II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned United

States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for DIB in July 2010, alleging he was disabled as of January 18, 2003,

because of the loss of three fingers on his left hand, mental distress, and emotional problems.[1]

(R.[2] at 178-79, 231.)  His application was denied initially and after a hearing held in April

2012 before Administrative Law Judge ("ALJ") Jhane Pappenfus.  (Id. at 11-28, 36-98, 106,

---

[1] The year appears to be an error; the hand injury occurred in 2004.  Plaintiff later amended his alleged disability onset date to be February 24, 2008.

[2] References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

113, 117-22.) After considering additional evidence, the Appeals Council denied Plaintiff's request for review, thereby effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and John Grenfell, Ed.D., a vocational expert, testified at the administrative hearing.

Plaintiff testified that he was then thirty-four years old and has a twelfth grade education. (Id. at 45, 48.) He lives with his daughter and parents. (Id. at 59.) He received a "modified" high school diploma. (Id. at 48.) Such a diploma is given to children with learning disabilities. (Id.) He is learning disabled in reading and math. (Id. at 49.) He is at a second-grade level in those two subjects. (Id.) He also attended the Missouri Sheriff's Association and Training Academy. (Id. at 49-50.) He was able to pass the Academy tests if someone read the tests to him and he gave them his answers. (Id. at 50.)

Plaintiff has worked as a dry wall installer, builder of windows on an assembly line, supervisor at Home Depot, warehouse forklift driver, and driver of a sweeper truck. (Id. at 52-54.) He received unemployment benefits approximately four years ago.[3] (Id. at 46.) When receiving unemployment, he looked for warehouse or lumber jobs and, once, applied to McDonald's. (Id.)

---

[3]The record reflects that Plaintiff received unemployment benefits in March 3, 2007, to August 7, 2007. (Id. at 225-26.)

On a typical day, Plaintiff gets dressed, watches his daughter go off to school, sits and watches television, and does a "little housework." (Id. at 57.) He washes his clothes and tries to wash some dishes. (Id.) When doing either chore, he can work for only five minutes before having to take a break. (Id. at 58.) Extremes of water temperature affect his left hand. (Id.) He usually sits in his bedroom because he does not like to be around a lot of people. (Id. at 59.) Twice a month, he visits a friend. (Id.) Before his hand was injured, he went out all the time and was very active. (Id. at 60.) Now, he gets in an argument with his parents or gets frustrated at least once or twice a week. (Id. at 60-61.)

Plaintiff has problems tying his shoes and buttoning his pants. (Id. at 61.) He can reach with only his right hand because of a left shoulder and hand injury. (Id.) He can "barely" grasp and pinch with his left hand. (Id. at 64.) He can push and pull only with his right hand. (Id.) He cannot lift anything heavier than ten to fifteen pounds, and can do that only occasionally. (Id.)

The pain in his left hand is constant. (Id. at 65.) The pain extends from the nubs of where his fingers used to be to his shoulder and neck. (Id.) He also has numbing and shocking feelings. (Id.) On a good day, the pain is a six on a ten-point scale. (Id. at 66.) Cold weather and temperature changes make it worse. (Id. at 66-67.) He cannot drive farther than five to six miles. (Id. at 67.) And, he has occasional tremors in his left hand. (Id.) These make it difficult for him to cut his food. (Id. at 67-68.)

Plaintiff injured his left shoulder when working at a hardware store in 2000. (<u>Id.</u> at 68-69.) When working at Home Depot, he worked in several different departments and was made a supervisor after four weeks. (<u>Id.</u> at 71.)

Plaintiff suffers from depression, post-traumatic stress disorder ("PTSD"), and flashbacks. (<u>Id.</u> at 70.) The latter come when he is sleeping. (<u>Id.</u>) He naps during the day. (<u>Id.</u>) Because of his depression, he has difficulties being around other people. (<u>Id.</u> at 72.) He gets upset and loses his "cool." (<u>Id.</u> at 73.) He cannot concentrate for longer than fifteen minutes. (<u>Id.</u>) Also, he has problems with mood changes and panic attacks. (<u>Id.</u>) He feels useless because he had been able to compensate for his borderline intellectual functioning by using his hands, but he no longer can. (<u>Id.</u> at 74.) He did not have PTSD before his accident. (<u>Id.</u>)

Asked by the ALJ to classify Plaintiff's past work, Dr. Grenfell replied that, under the *Dictionary of Occupational Titles* ("DOT"), Plaintiff's work as a yard supervisor was medium with a specific vocational preparation ("SVP") level of 7. (<u>Id.</u> at 77.) His job as a yard worker was medium with an SVP of 3, as were his jobs as a fork lift operator (referred to in the DOT as an industrial truck operator) and a parking lot sweeper. (<u>Id.</u> at 77, 78.) His job as a window maker on an assembly line was medium with an SVP of 2. (<u>Id.</u> at 77-78.) The job as a drywall worker was heavy with an SVP of 6; the job as a drywall mudder was medium with an SVP of 4. (<u>Id.</u> at 78.) These jobs did not have any specific transferrable skills. (<u>Id.</u> at 79.) The job of a yard supervisor had common supervisory skills, including maintaining simple records, that were transferrable. (<u>Id.</u>)

With his exertional limitations, Plaintiff will not be able to perform any of his past relevant work. (Id.) There are jobs, however, that "one-armed workers" who are unskilled can perform. (Id.) Three examples of such jobs include inspectors in the manufacturing field, operator of photocopy machines, and cashier in various settings. (Id. at 80-81.)

Dr. Grenfell further testified that there was no conflict between his testimony and the DOT. (Id. at 81.)

Asked by Plaintiff's attorney to state the reading level for the three examples he gave, Dr. Grenfell stated that the level for a cashier was a three, i.e., the person would have to read a variety of publications, including safety rules, write reports, and speak correct English. (Id. at 82.) Based on his forty years of experience, he found this DOT requirement to be inconsistent with the way the job of cashier is actually performed. (Id. at 85, 86.) Specifically, the DOT example of reading includes reading novels, newspapers, and journals; however, he has not found more than 5 to 2 percent of the population who read "manuals, novels, fiction." (Id. at 85-86.) The job of photocopy machine worker has a reading level of three; the job of inspector has a reading level of one. (Id. at 90.) Supervisory skills are not required for any of his three examples. (Id. at 91.)

Plaintiff would not be successful at any of the jobs cited by Dr. Grenfell if he worked at a 70 percent productivity level.[4] (Id. at 95.) Nor could Plaintiff perform the jobs if he had

---

[4]The bookkeeper for Dependable Lawn + Lot Care, LLC (Dependable Lawn), the company Plaintiff worked for from August 13, 2007, to February 24, 2008, reported that he worked at 70 percent of other employees' productivity. (Id. at 204.)

to be off task for ten minutes each hour. (Id. at 97.) If he could have only occasional contact with the public, the job of cashier would not be available. (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ includes forms Plaintiff completed as part of the application process, documents generated pursuant to his application, school records, records from health care providers, and assessments of his physical and mental functional capacities.

When applying for DIB, Plaintiff completed a Disability Report, listing January 31, 2007, as the date he stopped working because of his condition. (Id. at 231.) He explained on a separate form that he was fired from Home Depot in 2007 and then started work at Dependable Lawn. (Id. at 239.) He had to stop working there in 2008 due to the pain or stress. (Id. at 239.) Because, even with a work subsidy of 30 percent given to Dependable Lawn,[5] Plaintiff's earnings and length of employment did not qualify as an unsuccessful work attempt, it was recommended that his alleged disability onset date be amended to February 24, 2008, his last day of employment at Dependable Lawn. (Id. at 248.)

Plaintiff also completed a Function Report. (Id. at 292-99.) Asked to describe what he does during the day, he reported that he checks on his daughter after he gets up, eats meals, and stays in his room until she returns from school. (Id. at 292.) He then eats dinner and takes a nap. (Id.) It is hard for him to button anything, tie laces, or cut his food. (Id. at 293.)

_____

[5]The record also reflects that Dependable Lawn added a ball to the sweeper's steering wheel to help Plaintiff. (Id. at 222.)

The only meals he prepares are sandwiches or microwaved foods.  (Id. at 294.)  He does the dishes, but has to stop after ten minutes, and his laundry, but has a hard time folding the clothing.  (Id.)  He can only drive a short distance because the vibration hurts his hand.  (Id. at 295.)  He does not shop because he does not like to be around people.  (Id.)  He sees friends approximately once a month.  (Id. at 296.)  His impairments adversely affect his abilities to lift, reach, walk, remember, concentrate, understand, climb stairs, complete tasks, follow instructions, use his hands, and get along with others.  (Id. at 297.)  He needs help with written instructions because he needs someone else to read them to him.  (Id.)  He does not handle stress or changes in routine well.  (Id. at 298.)  He wears a gel glove on his left hand.  (Id.)

His mother completed a Function Report Adult – Third Party on Plaintiff's behalf.  (Id. at 251-58.)  She described his daily activities as taking a shower, eating meals, talking about not being able to work, and worrying.  (Id. at 251.)  She takes care of Plaintiff's daughter.  (Id. at 252.)  He does not have any problems with personal care tasks.  (Id.)  He sometimes needs to be reminded to take care of those tasks when he does not care how he looks.  (Id. at 253.)  He does light cleaning when he is able.  (Id.)  He has to have help if he engages in his former hobbies of hunting and fishing.  (Id. at 255.)  His impairments adversely affect his abilities to lift, concentrate, remember, use his hands, follow instructions, complete tasks, and get along with others.  (Id. at 256.)  He cannot read, but follows spoken instructions well.  (Id.)  He has to stop and rest for fifteen to twenty minutes after walking one-fourth mile.  (Id.)  He does not handle stress or changes in routine well.  (Id. at 257.)

On a Disability Report – Appeal form completed after the initial denial of his application, Plaintiff reported that his depression and anxiety were worse since he had completed the original report.  (Id. at 279.)  He was not taking any medications because worker's compensation would not pay for them and he could not otherwise afford them.  (Id. at 282.)

On an earnings report, annual earnings were listed for the years 1997 to 2008.  (Id. at 214.)  The lowest were $45,[6] in 2001; the highest were $25,721, in 2006.  (Id.)  The next highest were $27,403, in 1998, and $26,919, in 2003.  (Id.)  Plaintiff worked at Home Depot from 2002 to 2007 and at Dependable Lawn in 2007 and 2008  (Id. at 217-18.)

Plaintiff's school records from the St. Clair School District include a three-year evaluation conducted when he was in the eighth grade and one conducted when he was in the eleventh grade.  When in the eighth grade and fifteen years old, Plaintiff was given the Wechsler Intelligence Scale for Children – Revised ("WISC-R").  (Id. at 328-29.)  He had a verbal intelligence quotient ("IQ") of 79, a performance IQ of 79, and a full scale IQ of 74, placing him in the borderline range of intellectual functioning.  (Id.)  He had a "relatively high score" on the Comprehension subtest, indicative of "a strength for practical knowledge and social judgment."  (Id. at 329.)  When in the eleventh grade and eighteen years old, Plaintiff was given the Wechsler Adult Intelligence Scale – Revised ("WAIS-R").  (Id. at 320-26.)  He had a verbal IQ of 81, a performance IQ of 86, and a full scale IQ of 82, placing

--------

[6]All amounts are rounded to the nearest dollar.

him in the low average range of intelligence.  (Id.)  He could "identify one and *some* two syllable words."  (Id. at 324 (emphasis added).)

An Individual Education Program ("IEP") developed for Plaintiff when he was in the twelfth grade provided that he receive special education services in English, World Geography, and Math.  (Id. at 337-38.)  He was then functioning in the low average range of intellectual ability.  (Id. at 338.)  His weaknesses were in the areas of general knowledge, math memory, and reading experiences.  (Id.)  He was easily distracted and frustrated.  (Id.)

The medical records before the ALJ are primarily of his treatment for the work accident or include reports of independent medical examinations ("IME") conducted pursuant to his resulting worker's compensation claim.  Those records and reports are summarized below.

On January 18, 2004, Plaintiff was taken by ambulance to the emergency room at St. John's Mercy Medical Center after he amputated several fingers on his left hand when using a radial saw at Home Depot.  (Id. at 576-86.)  It was decided to transfer Plaintiff by air ambulance to Jewish Hospital in Louisville, Kentucky, for replantation of his fingers.  (Id. at 579.)  At Jewish Hospital, Plaintiff's left ring finger was able to be replanted; the index and long fingers were not.  (Id. at 588-99.)  The thumb was cleansed and debrided of nonviable tissue and debris.  (Id. at 598.)  Four days after admission, Plaintiff was discharged.  (Id. at 599.)

After a few post-operative visits to the surgeon at Jewish Hospital, Plaintiff was referred to Paul R. Manske, M.D., in Missouri for further follow-up care.  (Id. at 601-02, 625,

692-93.)  When first seeing Dr. Manske, on February 12, Plaintiff reported continued pain at the base of the left ring finger and the small finger.  (Id. at 625.)  His wounds were healing well; however, he had hypersensitivity of the thumb, index, and long finger tips and phantom pain of the index and long fingers.  (Id. at 626.)  Dr. Manske recommended that Plaintiff be fitted with a splint to protect the healing site of the ring finger.  (Id.)  A therapist was to show him desensitization techniques and range of motion exercises.[7]  (Id.)

Plaintiff saw Dr. Manske again on March 4.  (Id. at 623-34, 691.)  He had "early motion of the thumb, index, [and] long amputated digits" and was regaining motion in his small finger.  (Id. at 623.)  The range of motion in his ring finger was limited by the pins inserted for the replantation.  (Id.)  X-rays revealed that the ring finger's position was maintained.  (Id.)  Plaintiff's sutures were removed, and he was told he did not need to wear the protective splint once he was in a position where he would not sustain any direct trauma.  (Id.)

The following month, on April 8, Dr. Manske removed the two pins in Plaintiff's ring finger.  (Id. at 621-22.)  Plaintiff was to continue wearing the protective splint when he was out in public and was to work with the therapist on range of motion and strengthening exercises.  (Id. at 621.)  Dr. Manske predicted that Plaintiff would be released to return to light duty work after he saw him the next month.  (Id.)

---

[7]Plaintiff had physical therapy from February 29, 2004, to May 19, 2004, and again from July 23, 2004, to August 17, 2004.  (Id. at 610-16, 643-49.)  He did not keep an August 18 appointment.  (Id. at 642.)  He was reevaluated on November 9, following which he had three more sessions.  (Id. at 637, 639-40.)  It was noted at his last, December 7, session that he appeared motivated but was limited by a painful grasp when lifting and pulling.  (Id. at 636.)

Plaintiff returned to Dr. Manske on April 26, a week earlier than scheduled, "because the therapist [was] concerned that the tendons [were] slipping or that something [was] falling apart." (Id. at 686-88, 696.) Plaintiff had a reduced motion in two interphalangeal joints in the left ring finger. (Id. at 686.) Dr. Manske advised Plaintiff to work with the therapist on mobilizing the tendon in the ring finger and to wear the protective splint only when out in public. (Id.) Plaintiff could return to work for one-handed activities. (Id. at 686, 696.)

Plaintiff did return to work. (Id. at 683.) He informed Dr. Manske when seeing him on May 20 that he was having phantom pains in his long and index fingers. (Id. at 683-85.) He was not taking any pain medication and was advised to consider taking Tylenol. (Id. at 683.) He had no active or passive motion in two interphalangeal joints in his ring finger. (Id.) He was advised to work on strengthening exercises and was released to light work with assisted use of his left hand. (Id. at 684.)

Dr. Manske noted on August 19 that x-rays taken that day of Plaintiff's left wrist were "unremarkable." (Id. at 632-33, 680-82.) Plaintiff reported that his main problem was wrist pain. (Id. at 680.) When working, he would get pain in the left wrist that radiated to the shoulder. (Id.) On examination, he was tender over the dorsoradial aspect of the wrist, but he had full extension and flexion of the wrist. (Id.) Concerned that Plaintiff had wrist instability, Dr. Manske ordered a magnetic resonance imaging ("MRI") arthrogram of the wrist and nerve conduction tests of the median nerve. (Id.) Plaintiff was to continue working with his current restrictions. (Id. at 681.)

The MRI arthrogram of Plaintiff's left wrist and nerve conduction tests were normal. (Id. at 629-31, 678-79.) An electromyogram ("EMG"), also performed to rule out compression of the median nerve at his left wrist, was normal. (Id. at 629, 678-79.)

When seeing Plaintiff on October 25, Dr. Manske suggested he return to the work hardening program and remain there until obtaining maximum benefit from the program. (Id. at 678.)

Plaintiff underwent a functional capacity evaluation at BJC Union Rehabilitation Clinic (Rehabilitation Clinic) on January 12, 2005. (Id. at 654-61.) The evaluation revealed the following deficits. (Id. at 656.) Plaintiff had decreased strength and tolerance in his left upper extremity for repetitive or sustained gripping, thereby limiting his ability to perform most tasks. (Id.) As the fatigue in his left hand increased, so did the pain. (Id.) Plaintiff's tolerance of activity decreased. (Id.) The pain symptoms did not subside with brief rest periods, thereby limiting his ability to tolerate working five days a week. (Id.) That tolerance was further limited as evidenced by the decrease in his grip strength as the evaluation progressed. (Id.) He also had an "overall deconditioned status and back weakness/instability." (Id.) The evaluator opined that Plaintiff's abilities would fall within the category of light work. (Id.)

Plaintiff saw Dr. Manske again in February, reporting on his progress in the work hardening program. (Id. at 676-77.) Dr. Manske advised him to continue with the program until reaching maximum medical improvement. (Id.)

As noted in Dr. Manske's records, Plaintiff participated in a daily work hardening program at the Rehabilitation Clinic from March 7 to April 1. (Id. at 651-53.) Progress notes of March 19 indicate that his work capacity and endurance were improving. (Id. at 672-73.) He was then meeting eight of twelve critical job demands, as compared to the six he was meeting at the beginning. (Id. at 673.) He was to return to work part-time and continue in the program part-time. (Id.)

Plaintiff's functional capacity was assessed on March 30. (Id. at 667-71.) He was having difficulty working for four to five hours and then participating in the program for another four hours. (Id. at 667.) Plaintiff continued to struggle with weakness in his left upper extremity and to experience "significant pain with repetitive and sustained forceful gripping of his [left] hand." (Id.) It was noted that Plaintiff was "willing to tolerate a certain amount of increased pain" in order to return to work. (Id.) It was recommended that he gradually build up to a full eight-hour work day; take "'hot-pack'" breaks when his pain level was higher than five; wear protective gloves and finger sleeves during heavy exertions; and avoid carrying more than ten pounds when on the ladder. (Id. at 668.) It was also recommended that he be referred to a pain specialist for his complaints of continued phantom pain. (Id.)

A final assessment of Plaintiff's functional capacity was completed at the Rehabilitation Clinic on August 3. (Id. at 663-66.) It was noted that Plaintiff was then working six to eight hour days, but could tolerate seven to eight hours only when he was doing very little lifting and carrying. (Id. at 663.) His employer had been allowing him the

"'hot-pack'" breaks. (Id.) He was, however, having problems getting new gloves and finger sleeves when his current ones wore out. (Id.) Other employees were assisting him so he could avoid heavy lifting on ladders. (Id. at 664.) He had not been referred to a pain specialist, and was continuing to have phantom pain. (Id.) The grip strength in both hands had decreased. (Id.) He could grip only 18 pounds in his left hand (in January, it had been 20 pounds) and 95 pounds in his right hand (in January it had been 111 pounds). (Id.) The likely cause of the decrease was the regular work he was doing. (Id.) The March recommendations were continued. (Id. at 665.) It was also recommended that he wear a cushioned gel wrap on his forearm in addition to the glove and finger sleeves. (Id.) It was noted that Plaintiff was generally working at the medium level as defined in the DOT with the exception of overhead and horizontal lifting. (Id.) Both these were at a level less than medium. (Id.) It was further noted that continued pain and instability in his left ring finger caused concern about his ability to work at the medium level for an extended period. (Id. at 666.)

After next seeing Plaintiff, on October 24, Dr. Manske prescribed protective gloves and gel packs and referred him to a pain management clinic. (Id. at 675.) Plaintiff was not scheduled for a follow-up visit. (Id.)

Plaintiff returned to Dr. Manske on August 21, 2008, complaining of pain in his left hand. (Id. at 417-20.) In addition to "phantom pain for the thumb, index, and long finger," he had pain in the replanted ring finger whenever he bumped it. (Id. at 417.) Dr. Manske noted that Plaintiff had been laid off from his job because of persistent pain in his left hand.

(Id.)  He had no sensation in the ring finger and no functional motion beyond the metaphalangeal ("MP") joint.  (Id.)  On examination, he had a good range of motion in the MP joint, but no motion at the proximal interphalangeal ("PIP") joint.  (Id. at 418.)  The finger was "quite unstable" at the PIP joint.  (Id.)  It was decided that Plaintiff would benefit from an amputation of the left ring finger at the level of the PIP joint.  (Id.)  Dr. Manske opined that Plaintiff could return to work activity if the amputation was performed.  (Id.)

On October 29, Dr. Manske surgically amputated Plaintiff's left ring finger at the PIP joint.  (Id. at 454-57.)  Two weeks later, on November 13, Plaintiff reported to Dr. Manske that he was "doing quite well" and having no sharp, excruciating pain when touched on the tip of the left ring finger.  (Id. at 439.)  He was to be seen again in one month.  (Id.)

Plaintiff had a work hardening exit evaluation on January 2, 2009.  (Id. at 423-38.)  He "display[ed] material handling ability in the HEAVY work demand level in the floor to waist range and in the MEDIUM work demand level with lifting above waist level. [Plaintiff] is employable in at least the MEDIUM work demand level at this time . . . ."  (Id. at 423.)

After seeing Plaintiff on January 22, Dr. Manske recommended that he undergo nerve conduction tests.  (Id. at 440.)  If the tests were negative, Plaintiff could then return to work according to the recommendations of the work hardening exit evaluation.  (Id.)

EMG and nerve conduction studies of Plaintiff's left median and ulnar nerve performed on March 16 were within normal limits.  (Id. at 446-53.)  Dr. Manske released

Plaintiff to return to work at medium level as recommended in the work hardening evaluation. (Id. at 446, 463.)

On May 29, Plaintiff was taken by ambulance to St. John's Mercy Hospital emergency room after experiencing an anxiety attack at a family barbeque. (Id. at 469-81, 533-34.) He had been "thrashing about [and] yelling about his accident." (Id. at 471.) He improved when given Ativan, prescribed for the treatment of anxiety disorders.[8] (Id. at 472, 475, 476.) He was discharged with instructions to follow up with his primary care physician and return if his symptoms worsened. (Id. at 470, 480.)

Also before the ALJ were various IMEs of Plaintiff. The IMEs of two doctors, Drs. Stillings and Katz, are followed by treatment notes.

The earliest evaluation was one performed by Bruce J. Berwald, M.D., in February 2006 for a worker's compensation rating. (Id. at 705-08.) In addition to describing the pain in his left hand, Plaintiff reported that he had resulting emotional problems, did not like to go out with friends, often felt depressed, had crying spells, had sleeping difficulties, and had flashbacks of the accident. (Id. at 705.) He had not been referred to pain management as promised. (Id.) After reviewing Plaintiff's medical records and examining him, Dr. Berwald opined that Plaintiff had significant disability due to the loss of digits, the hypersensitivity of digits, phantom pain, and pain that radiated to the left arm. (Id. at 707.) The symptoms worsened with activity. (Id.) Dr. Berwald further opined that Plaintiff had PTSD leading to

---

[8]See Ativan, http://www.drugs.com/ativan.html (last visited Aug. 5, 2014).

generalized anxiety because of the work accident.  (Id. at 707-08.)  He recommended that Plaintiff undergo psychiatric evaluation and treatment.  (Id. at 708.)

Plaintiff had a psychiatric IME by Wayne A. Stillings, M.D., in August 2006.  (Id. at 353-60.)  "[Plaintiff] reported feeling depressed, with low moods, feeling alone, decreased interest, poor concentration, and middle insomnia."  (Id. at 354.)  He had flashbacks of the work accident; they were decreasing in frequency and intensity.  (Id.)  He also had crying spells.  (Id.)  He was then on light duty and working six to seven hours a day; the hours were limited by his left hand pain.  (Id. at 355.)  Everyday functions, e.g., getting dressed, mowing the grass, were more difficult because of the hand injury.  (Id.)  Because the work accident happened when there were a lot of people around and because he was self-conscious about the appearance of his left  hand, he did not like being in groups of people.  (Id. at 355-56.)  On examination, Plaintiff was alert and cooperative and had a normal rate and rhythm of speech.  (Id. at 358.)  His affect was appropriate, but bland; his mood was mildly depressed; his insight, judgment, and recent and remote memory were intact.  (Id.)  His verbal comprehension and concentration were good; his intellectual ability was normal.  (Id.)  His results on the Minnesota Multiphase Personality Inventory–2 ("MMPI-2") were "[i]nvalid due to an excessive number of unanswered questions."  (Id. at 359.)  His results on the Screening Index of Malingered Symptoms ("SIMS") indicated that he was "overreporting neurologic, depressive, and memory problems.  His style [was] to overreport his subjective complaints."  (Id.)  On the Wide Range Achievement Test ("WRAT"), he scored at the second grade level for reading and spelling and the first grade level for math.  (Id.)  Dr. Stillings diagnosed

Plaintiff with adjustment disorder with depressed mood and a few posttraumatic symptoms. (Id.) His Global Assessment of Functioning ("GAF")[9] was 58 to 62.[10] (Id.) Dr. Stillings opined that Plaintiff was not at maximum medical improvement in relation to his January 2004 work injury. (Id. at 360.)

In February 2008, Plaintiff had an IME by Stacey L. Smith, M.D. (Id. at 363-77.) He was then working at Dependable Lawn. (Id. at 365.) He was independent in his activities of daily living, but had difficulty tying shoes and buttoning pants. (Id. at 366.) He had to use a special knife to cut his food. (Id.) He reported being depressed and having difficulty sleeping. (Id.) He had had a flashback the previous November, but flashbacks were less frequent and intense than before. (Id.) He had friends, but did not like being around people. (Id.) He described his energy and memory as "'okay'" and his concentration as "'good.'" (Id. at 367.) He had not had a crying spell for the past two years. (Id.) His mood was "'up and down,'" ranging from happy to irritated within minutes. (Id.) His only medication was over-the-counter pain medication. (Id. at 368.) On examination, Plaintiff was oriented in all

---

[9]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).

[10]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id. (emphasis omitted).

spheres. (Id. at 369.) His insight was fair; his judgment was intact; his intellect was low average. (Id.) Dr. Smith diagnosed Plaintiff with adjustment disorder, not otherwise specified, with some post-traumatic and depressive symptoms, partially resolved. (Id. at 375.) His current GAF was 68.[11] (Id. at 376.) She recommended that Plaintiff take antidepressants and see a physiatrist, Richard T. Katz, M.D., who could also manage his psychiatric pharmacotherapy. (Id.)

The following month, Richard D. Wetzel, Ph.D., interpreted results of the MMPI-2 administered to Plaintiff by a technician in his office. (Id. at 380-85, 390-99.) Dr. Wetzel interpreted those results to reflect an exaggeration by Plaintiff of his symptoms, but no malingering. (Id. at 380.) The exaggeration might be attributable to his negative self-image. (Id. at 381.) Plaintiff's responses on the MMPI-2 also reflected low morale, a depressed mood, and feelings of alienation. (Id. at 382.) The pages of Dr. Wetzel's report with his diagnoses were missing and could not be recreated by him. (Id. at 384.)

In April, Plaintiff had an IME by Dr. Katz. (Id. at 404-11.) Plaintiff reported having pain in his left arm. (Id. at 405.) The pain varied between a three and five. (Id.) He also had neck pain and numbness in his left hand. (Id.) He was unemployed and looking for a new job. (Id. at 406.) He could sit or stand without pain for as long as he wanted. (Id.) Because of his pain, he could not walk farther than one-half mile. (Id.) Heavy lifting caused him pain. (Id.) He was anxious, depressed, nervous, worried, and anhedonic. (Id. at 407.) He had

---

[11]See note 10, supra.

trouble sleeping and low energy. (Id.) His muscle strength was normal, as was the range of motion in his left wrist and hand. (Id. at 408.) Tests for carpal tunnel syndrome were negative. (Id.) Dr. Katz noted that Plaintiff's left thumb was amputated at the interphalangeal joint; his left index and middle fingers were amputated at the PIP joint. (Id. at 409.) His left ring finger had been amputated to the PIP joint and reimplanted. (Id.) The finger got in the way of most of his activities. (Id.) Plaintiff could lift small objects "with the stumps and the 5th digit to thumb." (Id.) Dr. Katz recommended that the left ring finger be amputated to the PIP joint to improve the functioning of Plaintiff's left hand. (Id. at 410.) He also recommended that Plaintiff wear a gel foam glove and fingertip protective tips on his left hand. (Id.) He suggested that Plaintiff take amitriptyline (an antidepressant) and tramadol (a pain reliever). (Id. at 411.)

Dr. Katz saw Plaintiff again on September 2, noting that he was scheduled for surgery on his left ring finger. (Id. at 411.) Two weeks later, Plaintiff informed him that the medications were working. (Id.) He was sleeping better and his pain had decreased from an eight to a six. (Id.) The dosages of both medications were increased. (Id.) Plaintiff told Dr. Katz on October 20 that he was taking Cymbalta (an antidepressant) and trazodone (also an antidepressant). (Id. at 413.) Dr. Katz decided to stop the Ultram (the brand name of tramadol) to see if Plaintiff was getting adequate pain relief from the other two medications. (Id.) The amputation surgery was scheduled for October 29. (Id.) Plaintiff saw Dr. Katz on November 13, two weeks after the surgery. (Id. at 415.) He reported having good pain relief

on the Cymbalta and trazodone. (Id.) Dr. Katz concluded that Plaintiff was maximum medical improvement. (Id.)

While consulting Dr. Katz, Plaintiff was reevaluated by Dr. Stillings in October 2008. (Id. at 569-74.) Plaintiff reported being depressed as evidenced by low moods, insomnia, reduced concentration, and irritability. (Id. at 570.) On examination, he was alert and cooperative. (Id. at 571.) His speech was normal in rate and rhythm; his thoughts were logical and coherent; his affect was appropriate and forthright; his mood was "mildly clinically depressed"; his recent and remote memory were intact (Id. at 571, 572.) He was oriented to time, place, and person. (Id. at 572.) His intellectual functioning was in the normal range. (Id.) He wore a partial glove on his left hand. (Id. at 571.) On the MMPI-2 test, Plaintiff omitted twenty-four items. (Id. at 572.) Dr. Stillings opined that the resulting profile had marginal validity because Plaintiff "presented himself in an overly positive light with an improbable claim of virtue." (Id.) Plaintiff was also given the Millon Clinical Multiaxial Inventory – III ("MCMI-III") test. (Id.) The results of this test suggested "passive-aggressive, avoidant, schizoid, and depressive personality traits." (Id.) Dr. Stillings diagnosed Plaintiff with adjustment disorder with depressed mood and a few posttraumatic symptoms; reading, mathematics, and written expression disorders; and personality disorder, not otherwise specified. (Id. at 573.) Plaintiff's current GAF was 65. (Id. at 574.) He planned on treating Plaintiff with pharmacotherapy, i.e., Cymbalta and trazodone, and psychotherapy for approximately three months. (Id.)

Dr. Stillings saw Plaintiff again on October 27. (Id. at 568.) Plaintiff reported that the Cymbalta was causing him indigestion and nausea, so he had reduced the dosage. (Id.) His mood and pain had improved on the revised dosage. (Id.) The trazodone had improved his sleep and reduced his irritability. (Id.) Dr. Stillings was to see Plaintiff three weeks after the left ring finger surgery. (Id.) Instead, he saw Plaintiff eight weeks after, on January 8, 2009. (Id. at 567.) Plaintiff reported low moods, irritability, and increased dreams about the accident. (Id.) He appeared to be depressed. (Id.) The Cymbalta was discontinued in favor of Prozac. (Id.) The trazodone was continued. (Id.) Plaintiff telephoned Dr. Stillings in February, reporting that he was "doing fairly well" and the medications were satisfactorily working. (Id. at 566.) He was given another month's supply and was to obtain them in the future from his primary care physician. (Id.) Dr. Stillings concluded that Plaintiff was at psychiatric maximum medical improvement. (Id.)

In March 2010, Plaintiff had a psychiatric evaluation by Mitchell L. Glaser, M.D. (Id. at 505-07.) Plaintiff reported that he had "severe pain, aching and shock-type feelings in his left hand." (Id. at 505.) He isolated himself, stayed at home, and did not socialize. (Id.) He could not do carpentry, in part, because working with tools reminded him of the accident and caused him emotional distress. (Id.) He was constantly on guard, worried that something bad might happen to him, and afraid of being in another accident. (Id.) He was usually anxious, depressed, and sad. (Id. at 506.) He did not think things were going to improve for him. (Id.) He stopped taking Cymbalta and trazodone because he could not afford them after losing his medical insurance. (Id.) On examination, Plaintiff became tearful as the interview

progressed.  (Id.)  His speech was normal in rate but slightly decreased in volume.  (Id.)  He

appeared to have low average intelligence.  (Id.)  He was alert and oriented to time, place, and

person.  (Id.)  His thought process was generally goal directed.  (Id.)  Dr. Glaser opined that

Plaintiff was suffering from PTSD and was unable to work because of it.  (Id.)  Plaintiff's

current GAF was 43.[12]  (Id. at 507.)

Dr. Glaser evaluated Plaintiff again in November.  (Id. at 499-504.)  On examination,

Plaintiff was much as he had been in March, with the added observation that his affect was

dysthymic (depressed).  (Id. at 503.)  As before, Dr. Glaser diagnosed Plaintiff with PTSD

and a GAF of 43.  (Id.)  He also diagnosed him with adjustment disorder with depression and

anxiety with chronic stressor.  (Id.)  He opined that, based on Plaintiff's IQ scores from his

school years and on his educational history, Plaintiff was not suited for an administrative,

desk, or management job.  (Id. at 504.)  The emotional distress Plaintiff suffered as a result

of his amputated hand further lowered his "already impaired cognitive dysfunction."  (Id.)

Dr. Glaser opined that Plaintiff was permanently disabled and unable to work.  (Id.)

A vocational rehabilitation evaluation of Plaintiff was completed by James Israel,

C.R.C., C.V.E., in February 2011.  (Id. at 269-77.)   Plaintiff primarily complained of

"constant tightness in the neck region" and discomfort that radiated from his neck through his

left upper extremity.  (Id. at 270.)  Also, he had intermittent burning sensations from his left

---

[12]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,
occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34
(emphasis omitted).

shoulder through his left arm and hand. (Id.) He lacked energy, was depressed and anxious since his work accident, and had PTSD. (Id.) He "reported extensive functional impairment." (Id.) Specifically, he had a loss of strength, particularly with lifting and carrying, and difficulty performing tasks requiring upper arm strength and movement. (Id.) His lower limb movement and strength were adequate. (Id.) He walked without support and had a good ability to communicate. (Id.) His physical discomfort increased as the evaluation progressed. (Id.) Plaintiff reported to Mr. Israel that he had been in excellent health before his January 2004 work injury. (Id. at 271.) He had accidently amputated his left thumb and second, third, and fourth digits when he was pushed and bumped by a customer while operating a circular saw at Home Depot. (Id.) The fourth digit was reattached, but had to be subsequently amputated after he continued to have severe neurologic and muscular problems with the digit. (Id.) He returned to light duty, but had to stop due to pain. (Id.)

Plaintiff was given the WRAT Third Revision. (Id. at 273.) He performed at the second grade reading and arithmetic levels and the first grade spelling level. (Id.) Mr. Israel opined that Plaintiff "could expect considerable difficulty performing occupations and vocational training programs where average academic skills are essential." (Id.) He had difficulties performing the Purdue Pegboard Test due to his left hand dysfunction. (Id. at 274.)

Summarizing Plaintiff's work experience, Mr. Israel noted that all his jobs required manual skills. (Id.) He also noted Plaintiff's rise "from unskilled to skilled jobs" during the relevant period and opined that "he has acquired industry specific knowledge or skills

transferable to other types of closely related work as performed in the local or national economy." (Id. at 275.) With his age, educational background, skills, physical and mental limitations, and pain, Plaintiff was "insurmountably disadvantaged." (Id. at 276.) Employers "would avoid hiring an individual with [Plaintiff's] overall profile in favor of individuals who are more work ready and able." (Id.) Mr. Israel further concluded that Plaintiff had been able to compensate for his learning disabilities by emphasizing "the bilateral use of his hands in industry intricate tasks." (Id. at 277.) The work accident eliminated that strategy. (Id.)

In August, Plaintiff had an IME by Paul M. Packman, M.D. (Id. at 511-30.) Plaintiff's chief complaint was "emotional[ ] depress[ion]." (Id. at 512.) After summarizing the reviewed medical records and various depositions taken pursuant to Plaintiff's worker's compensation claim, Dr. Packman also summarized Plaintiff's history. (Id. at 512-26.) Plaintiff reported he had been unable to continue at Home Depot after returning from his work injury because of pain and emotional symptoms. (Id. at 525.) He subsequently had nightmares and flashbacks about the accident. (Id.) He was hypervigilant and "ha[d] significant emotional bunting." (Id.) He had panic attacks manifested by such symptoms as chest pressure, pain, lightheadedness, and difficulties breathing. (Id.) These had decreased in frequency and were then occurring three times a week. (Id.) He was depressed, suffered from insomnia, and had increased irritability and decreased enjoyment. (Id.) He had chronic pain in his left hand. (Id. at 526.) The pain was worse in cold weather. (Id.) He smoked one-half to one pack of cigarettes a day. (Id. at 527.) On examination, Plaintiff was alert and cooperative. (Id.) He had a blunt affect and low mood. (Id.) His general fund of knowledge

was fair.  (Id.)  His insight and judgment about his clinical condition were appropriate.  (Id. at 528.)  Dr. Packman diagnosed Plaintiff with chronic PTSD with panic attacks; chronic major depressive disorder; chronic pain syndrome secondary to traumatic amputation; and borderline mental retardation with reading, mathematics, and written expression disorders.  (Id.)  His GAF was 35.[13]  (Id.)  Dr. Packman recommended that Plaintiff be treated with Cymbalta and psychotherapy.  (Id. at 529-30.)  He also recommended that Plaintiff wear the gel form protective glove and fingertip protective tips he had been prescribed but was no longer receiving.  (Id. at 530.)

In October, James M. England, Jr., a vocational rehabilitation counselor, completed a vocational rehabilitation evaluation of Plaintiff based on written records and depositions.  (Id. at 545-54.)  He concluded that Plaintiff's inability, as found by at least Drs. Packman and Glaser, to function in the open labor market was due primarily to "the psychiatric aspects of his disability rather than simply the injury to his hand in isolation."  (Id. at 554.)

Three days later, June M. Blaine, M.S., C.R.C., completed a vocational rehabilitation assessment of Plaintiff.  (Id. at 556-60.)  In addition to reviewing medical records and depositions, Ms. Blaine interviewed and tested Plaintiff.  (Id. at 556.)  Plaintiff reported that he had been able to pass the written test for a driver's license by having it read to him.  (Id. at 557.)  He also reported that he had been accommodated when employed at Home Depot by not being required to complete paperwork or make computer entries.  (Id. at 558.)  His

_____

[13]A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  DSM-IV-TR at 34 (emphasis omitted).

physical abilities compensated for his lack of academic skills. (Id.) He got a job after Home Depot because of a friend; he had to quit after four months because he was in too much pain. (Id.) Plaintiff was given the WRAT, Revision 4, and scored at grade 1.9 in word reading and sentence comprehension and grade 2.2 in math computation. (Id.) When being read the sentence comprehension section, however, he scored at grade 11.5 (Id.) Ms. Blaine opined that Plaintiff was limited by his learning disability "and the fact he was able to complete his job duties with accommodations and receive promotions without being able to read and write." (Id. at 560.) His learning disability would preclude retraining him. (Id.) She further opined that an employer would not hire Plaintiff due to his mental, physical, and intellectual limitations. (Id.)

The same day, Plaintiff had an IME by Charles Nathan, M.D., a plastic surgeon. (Id. at 537-43.) On examination, Plaintiff had a significantly decreased grip strength in his left hand, a positive Tinel's sign and carpal compression test over the median nerve in his left wrist, a positive Tinel's sign over the left cubital tunnel, and pain over the dorsal and radial aspect of his left wrist. (Id. at 539.) On entering and leaving the examination room, Plaintiff kept his left hand in his pocket, although he did not know Dr. Nathan was observing him. (Id.) Dr. Nathan agreed with the recommendation of a certified and licensed prosthetist that Plaintiff be fitted for a custom prosthetic system that would include a bifunctional three finger prosthetic. (Id. at 540, 544.) This system would cost approximately $21,000. (Id.) Dr. Nathan opined that Plaintiff would also require chronic pain medication management and was

"going to have a lifetime of chronic pain in his left hand and arm." (Id. at 540-41.) His significant depression and educational level would affect his employability. (Id. at 541.)

The next month, Charles A. Goldfarb, M.D., an orthopedist, performed an IME of Plaintiff. (Id. at 561-65.) Dr. Goldfarb reviewed records and examined Plaintiff. (Id.) He found Plaintiff to be "clearly limited with discomfort and functional limitations in the left upper extremity." (Id. at 564.) He recommended that Plaintiff be fitted with a passive prosthetic device, finding that active finger flexion prosthetics would not make a big difference for Plaintiff. (Id.)

Also before the ALJ were assessments of Plaintiff's functional capacities completed pursuant to his DIB application.

In October 2010, Plaintiff was examined by Raymond Leung, M.D. (Id. at 483-85.) Plaintiff was able to lift ten to twenty-five pounds with his left hand. (Id. at 483.) He reported having difficulties gripping things with that hand. (Id.) He occasionally took aspirin. (Id.) On examination, he was alert and oriented to time, place, and person and was not in apparent distress. (Id. at 484.) His memory was intact; his affect, dress, hygiene, and fund of knowledge were normal. (Id.) He could not pick up a penny from the table with his left hand. (Id.) His left arm strength was 5/5. (Id. at 485.) He had decreased sensation to a light touch to the second through fourth fingers of his left hand. (Id.) His left pinch and grip strength were 4+/5. (Id.)

In November 2010, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Nola Townley, a single decisiomaker.[14] (Id. at 107-12.)  The primary, and only, diagnosis was partial amputation of left digits.  (Id. at 107.)  This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and sit, stand, or walk for approximately six hours in an eight-hour workday.  (Id. at 108.)  His ability to push and pull was otherwise unlimited.  (Id.)  He had postural limitations of never climbing ladders, ropes, and scaffolds and only occasionally crawling.  (Id. at 109.)  He had limited abilities to reach, finger, and feel.  (Id.)  He had no visual, communicative, or environmental limitations.  (Id. at 109-10.)

The same month, a Psychiatric Review Technique form was completed by Kyle DeVore, Ph.D.  (Id. at 487-97.)  Plaintiff was found to not have a medically determinable mental impairment.  (Id. at 487.)

### The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through June 30, 2009, and had not engaged in substantial gainful activity since his alleged onset date of February 24, 2008.  (Id. at 16.)  The ALJ next found that Plaintiff has severe impairments of residuals from partial amputation of fingers on his left hand, an adjustment

_____

[14] See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

disorder, and learning disabilities. (Id.) He did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity. (Id.)

Addressing Plaintiff's adjustment disorder, the ALJ found he had no restrictions in his activities of daily living. (Id. at 17.) She found both that he had problems with personal care and that he did not have. (Id.) He could make sandwiches, use a microwave, do his own laundry, and drive only short distances. (Id.) "He went outside almost every day." (Id.) He could not read. (Id.) He also had no difficulties with social functioning. (Id.) He spent time with his parents and daughter, with whom he lived, and saw friends once or twice a month. (Id.) He had moderate difficulties with concentration, persistence, or pace. (Id.) He had had others complete forms and paperwork for him at work. (Id.) He had not had any episodes of decompensation. (Id.) Plaintiff's IQ scores did not satisfy listing criteria. (Id.)

With his impairments, Plaintiff has the exertional residual functional capacity ("RFC") to perform light work except he should avoid climbing ropes, ladders, and scaffolds and should avoid handling/gross manipulation and fingering/fine manipulation with his left hand. (Id. at 18.) He could understand, remember, and carry out at least simple instructions and non-detailed tasks. (Id.) The ALJ noted that "there [was] little evidence of ongoing medical care of the [left] hand since his alleged onset date." (Id. at 20.) And, "[d]espite his allegations of complete and total disability, [Plaintiff] worked after his injury." (Id. at 21.) The ALJ also noted, with emphasis, that Plaintiff had received unemployment compensation benefits after he stopped working and, to qualify for those benefits, had to present himself as

"ready, willing, able to work, and out looking for work." (Id. at 22.) She found this inconsistency to "reflect[] poorly on his credibility." (Id.)

The ALJ then addressed the opinion evidence rendered for purposes of Plaintiff's worker's compensation litigation. (Id.) She found the results of the work hardening evaluation to be more credible than those of Dr. Nathan. (Id. at 25.) She also noted that Plaintiff had not reported mental difficulties until his 2006 IME with Dr. Stillings. (Id.) His return to work after the accident and his seeking work in lumberyards after then negated the diagnosis of PTSD. (Id.) And, despite his lack of mental health care, he had not had any significant deterioration in his mental status. (Id.) The ALJ also discounted the conclusions in the three vocational rehabilitation evaluations that the combination of Plaintiff's learning disabilities and left hand injury prevented him from any employment. (Id. at 26.)

Next, the ALJ found Plaintiff's allegations not to be credible based on his returning to work at light duty for almost two more years after his injury; the lack of any evidence from Home Depot as why he left work; his work operating a sweeping machine after leaving Home Depot; his looking for work; his pending worker's compensation claim; the work hardening evaluation finding him capable of medium work; his being in jail for a driving while intoxicated ("DWI") charge seven months before the hearing; his "relatively normal" activities of daily living; and being "a supervisor for nearly all his employers." (Id.)

With his RFC, Plaintiff could not return to his past relevant work. (Id.) He had, however, acquired work skills of supervision and simple record keeping from that work. (Id.) Considering those skills, his age, education, and RFC, Plaintiff could perform the work

described by the VE, e.g., bottling attendant, photocopier, and cashier. (<u>Id.</u> at 27.) The ALJ discounted hypotheticals posed by Plaintiff's counsel as not being supported by the record. (<u>Id.</u>) The ALJ further found that the VE's testimony was consistent with the information in the DOT. (<u>Id.</u>)

The ALJ then concluded that Plaintiff was not disabled within the meaning of the Act. (<u>Id.</u>)

## Additional Medical Evidence Before the Appeals Council

After the ALJ rendered her adverse decision, Plaintiff submitted records of Gregg Bassett, M.D., to the Appeals Council. Those records are of an April 2012 psychiatric evaluation of Plaintiff by Dr. Bassett for problems caused by the work accident. (<u>Id.</u> at 710-15.) Plaintiff reported that he dreamt of the injury two or three times a week. (<u>Id.</u> at 710.) When in a crowded store, he became irritable and had flashbacks. (<u>Id.</u>) Dr. Bassett diagnosed Plaintiff with chronic PTSD and assigned him a GAF of 50 to 51. (<u>Id.</u> at 714.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 423(d)(1). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **<u>Barnhart v. Walton</u>**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his

previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'"  **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(c).  A"severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.  **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's

complaints.  **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523.

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547

F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

### Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole in that she erred by failing to properly consider his PTSD, supported in part by Dr. Bassett's findings, and chronic pain disorder as severe impairments. The Commissioner argues that the ALJ properly assessed Plaintiff's credibility, therefore, her other findings are also supported by the record. The Court disagrees with the Commissioner.

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011). In the instant case, the reasons given by the ALJ are not supported by the record.

First, the ALJ found that Plaintiff returning to work for almost two years detracted from his credibility. Plaintiff returned to work four months after his January 2004 injury, and gradually increased his hours. He was restricted to one-handed activities. Moreover, it was noted three months after his return to work that he was doing very little lifting and carrying and was being accommodated with "hot-pack" breaks. Although the ALJ found it telling that there was no statement from Home Depot about why Plaintiff left the job, Dr. Manske noted that he had been laid off because of persistent pain. Additionally, rather than find that the absence of a statement of the type not usually included in the administrative record detracted from Plaintiff's credibility, if the ALJ considered the reason why Plaintiff left Home Depot significant, she could have inquired about why or requested such a statement in furtherance of her "duty to develop the facts fully and fairly." **Bowman v. Barnhart**, 310 F.3d 1080, 1083 (8th Cir. 2002) (internal quotations omitted).

The evidence in the record is that, following his January 2004 injury, Plaintiff wanted to return to work and was willing to endure some pain in order to do so. In furtherance of this goal, he attended a work hardening program, received accommodations from Home Depot, and tried to work at another job after being terminated from Home Depot. In **Kelley v. Callahan**, 133 F.3d 583, 588 (8th Cir. 1998), the Eighth Circuit Court of Appeals held that the ALJ erred by discrediting the complaints of pain of a claimant who had continued working for several years in spite of her limitations in an effort to be eligible for her pension. "The presumption that a claimant is not disabled merely because the claimant had a lenient employer, a high tolerance for pain, or no other means of support would unfairly shift the

burden of proof back onto the claimant at a point in the proceedings when the burden rightfully belongs on the Commissioner." **Id.** See also **Brosnahan v. Barnhart**, 336 F.3d 671, 677 (8th Cir. 2003) (declining to see how claimant's participation in vocational rehabilitation after injury undermined her credibility or "show[ed] anything other than good-faith attempt to return to work") **Burnside v. Apfel**, 223 F.3d 840, 845 (8th Cir. 2000) (finding that solid work record and seeking clearance from physician to return to work supported credibility of claimant's subjective complaints).  If a lack of motivation to return to work detracts from a claimant's credibility, see **Fredrickson v. Barnhart**, 359 F.3d 972, 977 (8th Cir. 2004), Plaintiff's motivation to return should not also detract.

Also, in so finding that a return to work detracted from Plaintiff's credibility, the ALJ disregarded the evidence that Plaintiff did not return to work after his amended alleged disability onset date in February 2008 and also disregarded his subsequent October 2008 surgery to amputate the left ring finger.  The importance of the functioning of this finger is reflected in the August 2005 final assessment of Plaintiff's functional capacity.  It was noted in that assessment that pain and instability in the replanted finger raised concerns about Plaintiff's ability to function at a medium exertional level for any extended period.

The ALJ considered Plaintiff's work operating a sweeping machine after he left Home Depot as detracting from his credibility.  The evidence is, however, that a friend helped him get the job; his employer, Dependable Lawn, received a 30 percent work subsidy for Plaintiff;

Plaintiff's productivity was 70 percent of that of other employees[15]; and that changes were made to the steering wheel of the sweeping machine to allow Plaintiff to drive it. <u>See</u> 20 C.F.R. § 404.1573(c) (requiring that the provision of special equipment and being allowed to work at a lower standard of productivity than other employees be considered when determining whether a claimant's work is substantial gainful activity). Even so, Plaintiff could not continue performing the job. The day he left is his amended disability onset date.

Another consideration the ALJ found to be a detractor from Plaintiff's credibility is his pending worker's compensation claim. "[A] possible disincentive to return to work because of [a claimant's] worker's compensation litigation" may undermine the claimant's credibility. **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012). In the instant case, however, Plaintiff did attempt to return to work after his January 2004 work injury – an attempt the ALJ found to detract from his credibility. And, surely the ALJ does not mean to suggest that a claimant should be forced to choose between filing for DIB and filing a worker's compensation claim after four fingers are amputated in a work-related injury. Moreover, the Eighth Circuit has "noted that 'all disability claimants are financially motivated to some extent.'" **O'Donnell v. Barnhart**, 318 F.3d 811, 817 (8th Cir. 2003) (quoting <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 581 n.4 (8th Cir. 2002)).

---

[15]The Commissioner contends that the bookkeeper's report should be disregarded because it was completed more than two years after Plaintiff left the job. The record reflects, however, that the productivity answer was to a Social Security Administration ("SSA") form questionnaire that was sent to Dependable Lawn by the SSA pursuant to Plaintiff's DIB application. Given the lack of any evidence to the contrary, there is no reason to doubt the accuracy of the bookkeeper's report.

The ALJ found that Plaintiff had no restrictions in his daily activities and that "relatively normal" activities detracted from his credibility. (See R. at 26.) The activities, as earlier summarized by the ALJ, included making sandwiches, using a microwave, doing his own laundry, driving short distances, and going outside. Also, he got his teen-age daughter up for school. "[I]t is well-settled law that a claimant need not prove [he] is bedridden or completely helpless to be found disabled." **Reed v. Barnhart**, 399 F.3d 917, 923 (8th Cir. 2005). Indeed, the Eighth Circuit "has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." **Kelley**, 133 F.3d at 589. Thus, in **Tang v. Apfel**, 205 F.3d 1084, 1086 (8th Cir. 2000), the court held that the claimant's activities of getting his children ready for school and doing the laundry "provide[d] scant evidence of his ability to perform full-time work." In **Burnside**, 223 F.3d at 845, the court held that the claimant's daily activities of mowing the lawn, tinkering on old car, woodworking, feeding and checking on his children's pet ducks, occasionally cooking, driving around town, grocery shopping, and running errands were not inconsistent with his allegations of disabling impairments. Plaintiff's daily activities are not as extensive and are not "relatively normal." Cf. **Medhaug v. Astrue**, 578 F.3d 805, 817 (8th Cir. 2009) (claimant's activities of cooking, vacuuming, washing dishes, doing laundry, shopping, driving, walking four miles, and occasionally mowing lawn were inconsistent with complaints of disabling pain); **Gregg v. Barnhart**, 354 F.3d 710, 713 (8th Cir. 2003)

(claimant's daily activities including tending livestock and moving hay for one to two hours daily were inconsistent with allegations of disabling pain).

Two other considerations cited by the ALJ when discounting Plaintiff's credibility are his receipt of unemployment benefits and his work as a supervisor for "nearly all of his employers." These are not supported by the record. Plaintiff received unemployment benefits after he was laid off from Home Depot and before working for Dependable Lawn. "[S]eeking work and working at a job while applying for benefits are activities inconsistent with complaints of disabling pain." **Dunahoo**, 241 F.3d at 1039. However, Plaintiff's application and amended disability onset date are both *after* he received unemployment benefits. Also, the evidence is that Plaintiff worked as a supervisor for only one employer, Home Depot, and he did so only by having other employees complete the required paperwork for him.

The ALJ correctly noted in her decision Plaintiff's lack of ongoing medical treatment. This may be a proper consideration when evaluating a claimant's credibility. See **Casey v. Astrue**, 503 F.3d 687, 693 (8th Cir. 2007). In the instant case, the evidence is that Plaintiff had achieved maximum medical improvement of his left hand impairment. No further treatment was available.

In addition to the ALJ's credibility assessment not being supported by the record, her citation to three jobs Plaintiff can perform is also not supported. The ALJ found that Plaintiff can perform three jobs cited by the VE: bottling attendant, DOT 920.687-042; photocopying machine operator, DOT 207.685-014; and cashier, DOT 211.462-010. The job of bottling attendant has a language level of one, i.e., the person must be able to recognize the "meaning

of 2,500 (two- or three-syllable) words" and "[r]ead at [a] rate of 95-120 words per minute."

DOT, 1991 WL 687971 (4th ed. rev. 1991). The job of photocopying machine operator

requires the same language level.[16] DOT, 1991 WL 671745 (4th ed. rev. 1991). The job of

cashier requires a higher language level, a two. DOT, 1991 WL 671840 (4th ed. rev. 1991).

At this level, a person must be able to read at a rate of 190-215 words per minute; read

adventure stories, comic books, and assembly instructions for model cars and airplanes; and

look up unfamiliar words in the dictionary. The ALJ held, however, that Plaintiff *cannot*

read. And, the evidence is that he can recognize *some* one- and two-syllable words. There

is no evidence he can recognize any three-syllable words.

Asked about the reading level of a cashier, the VE testified, that in his experience,

cashiers did not read the material cited for the required reading level. See note 17, supra. The

question, however, is whether a person *can* read at the required level. The record, including

the ALJ's findings, are that Plaintiff cannot.

Additionally, the ALJ found that the VE's testimony was consistent with the DOT. The

VE testified that it was, but then explained a discrepancy between his assessment of the

requirements for a cashier and the DOT's. This discrepancy should be addressed on remand.

---

[16]The Court notes that the VE testified that the jobs of photocopying-machine operator and
cashier require a reading level of three. This level requires that the person read "a variety of novels,
magazines, atlases, and encyclopedias" and "safety rules, instructions in the use and maintenance of
shop tools and equipment, and methods and procedures in mechanical drawing and layout work."
DOT: Appendix C, 1991 WL 688702 (4th ed. rev. 1991).

## Conclusion

For the reasons discussed above, the ALJ's credibility assessment and reliance on the VE's testimony are not supported by substantial evidence on the record as a whole. On remand, Plaintiff's credibility should be re-evaluated and the availability of jobs a claimant can perform with Plaintiff's physical impairment and reading disability should be revisited. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED for further proceedings as outlined above.

An appropriate Order of Remand shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  8th  day of August, 2014.